UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JANE C. KELLEY,

        Plaintiff,

v.                                            Case No. 11-C-600

TINA M. DAHLE, TINA M. DAHLE SC,
and WISCONSIN LAWYERS MUTUAL
INSURANCE COMPANY,

        Defendants.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

        On June 21, 2011, Plaintiff Jane C. Kelley filed this diversity action against Defendants Tina M. Dahle (Dahle), Tina M. Dahle S.C. (the Law Firm), and Wisconsin Lawyers Mutual Insurance Company (WILMIC) alleging a breach of contract, negligence, and a breach of fiduciary duty. (Compl., ECF No. 1 ¶¶ 17–30.) The claims are based on the failure of Dahle and her law firm to repay a $300,000 loan solicited from Kelley on or around October 27, 2009. Before me now is WILMIC's motion for summary judgment (ECF No. 26) in which it claims its policy does not cover any of Kelley's claims. For the reasons discussed herein, the motion will be granted.

### BACKGROUND

        Kelley is a resident of California who owns, through a living trust, a condominium in Sister Bay, Wisconsin. (WILMIC Br., ECF No. 27 at 2.) Dahle is an adult resident and citizen of Wisconsin and an attorney licensed to practice law in the state of Wisconsin. (Compl. ¶ 2.) The

Law Firm is a Wisconsin corporation with its principal place of business located in Green Bay, WI. (*Id.* ¶ 3.) Dahle is the registered agent for the Law Firm and the sole shareholder of the Law Firm. (*Id.*) WILMIC is a Wisconsin corporation licensed to sell insurance in Wisconsin, with its primary place of business in Madison, WI. (*Id.* ¶ 4.) The Law Firm purchased a "claims made" malpractice policy through WILMIC covering the period from July 1, 2010 through June 20, 2011. (*Id.* ¶ 5.)

Kelley and her fiancee, Richard Hill, first retained Dahle through the Denissen Firm as counsel in approximately June 2004 to pursue a claim against the State of Wisconsin. (Kelley Decl., ECF No. 32 ¶¶ 3–4.) In 2005, Dahle left the Denissen Firm to start her own firm, Defendant Tina M. Dahle, S.C. (Kelley Decl. ¶ 5, Ex. 3 at P133–134.) Kelley and Hill elected to have all their files, which numbered four at the time, go with Dahle to the new firm. The files included a dispute with the Wisconsin DNR over permits for shore protection work, a potential dispute with the Village of Sister Bay over zoning enforcement, and a dispute with Bay Shore Estates (BSE), which is a neighbor of Kelley's at her Sister Bay vacation home, as well as a general file for "whatever came up." (Kelley Dep., ECF No. 33-1 at 31:5–44:4; Hill Dep., ECF No. 33-3 at 17:5–21:18.) By 2008, the dispute with BSE had mushroomed into litigation, still ongoing (the BSE case). (*Id.*) The DNR and Sister Bay matters never resulted in litigation. (*Id.*) Dahle and her firm also handled miscellaneous matters that arose from time to time, such as writing a "nasty-gram" to Yahama about a blown jet ski motor that Yahama refused to cover under warranty. (Hill Dep. at 74:3–25.)

Kelley frequently corresponded by email with Dahle and her associate, Ken Baumgart, once the BSE case was filed. On July 15, 2009, Kelley shared with Baumgart her frustration with delays in refinancing her mortgages. Later that day, she forwarded the email to Dahle as well. (Kelley Decl. ¶ 7.) Dahle, in response, lamented her own difficulties in obtaining a loan for "only

2

$300,000." (*Id.*) Dahle subsequently called Kelley and told her she was considering borrowing the $300,000 from an unidentified client whom she called "shady." (Kelley Dep. at 91:12–92:21.) Dahle claimed that in return for the loan, the client, whom she represented on a number of matters, would not be paying her any legal fees in cash. (*Id.*) Kelley told Dahle not to borrow from the shady client but instead offered to loan Dahle the money herself instead. (Kelley Dep. at 92:23–93:23; 97:15–100:23.)

On July 28, 2009, Dahle sent Kelley an email outlining proposed terms for the loan. (Kelley Decl., Ex. 5 at P024.) Dahle proposed that the loan would be documented by a promissory note and secured by a mortgage from an entity known as TNT Commercial Acquisitions, L.L.C. (*Id.*) The note would have a five-year repayment schedule, beginning in July 31, 2009, with interest at 5%, which would have entailed monthly payments of $5,661.37. (*Id.*) However, Dahle stated the loan could be paid on a four-year amortization schedule by making payments of $1,588.37 per week. (*Id.*) Additionally, any legal fees Kelley incurred would be credited against the balance due on the loan such that Kelley would no longer have to pay legal fees out of pocket every month and the loan would likely be paid off in two to three years. (*Id.*) Dahle did not advise Kelley to consult with an independent attorney about the loan. (Kelley Decl. ¶ 2; Steichen Decl., ECF No. 28 ¶ 6, Ex. E ¶ 9.)

The parties did not reach an agreement on the terms of the loan in July 2009. (Kelley Dep. at 138:24–139:17.) On July 30, 2009, Kelley indicated a reluctance to make the loan at that time because she needed to show large cash reserves until her refinancing was completed. (Kelley Decl., Ex. 5 at P021–022.) But as the summer progressed, Dahle continued to press her about the loan. (*Id.* at P017–021.) Eventually, on October 27, 2009, Kelley wrote Dahle two checks, one for $200,000 and one for $100,000. (Dahle Dep. at 74:7–75:3; Dahle Am. Resp. to Pl's 1st Req. For

3

Admissions, ECF No. 33-5 at P047–048.) Both checks were made out to Dahle personally and bore the word "loan" in the memo section. (*Id.*) Kelley later wrote the words "TNT Commercial" on one of the checks. (Kelley Dep. at 121:19–122:8; Dahle Dep. at 75:8–10.) Contrary to what the parties had discussed in July, the loan was not documented by a promissory note, nor was it secured by a mortgage from TNT Commercial Acquisitions (or any other entity). (Kelley Dep. at 112:10–114:9; Dahle Dep. at 67:13–14.) Dahle never made any monthly or weekly payments as her July 28 email had discussed. (Kelley Dep. at 116:19–117:7; Dahle Dep. at 27:14–28:14.) Kelley's legal fees were also not credited against the amount due on the loan. (Kelley Dep. at 140:22–141:4.)

In August 2010, Dahle came up to Sister Bay and the parties sat down to work out the terms of the loan. (Steichen Decl. ¶ 5, Ex. D at 4.) Dahle again proposed an interest rate of 5%. (*Id.*) Hill insisted that 8% or 8.5% would be more appropriate. (*Id.*) Kelley and Dahle eventually agreed on an interest rate of 6.5%. (*Id.*; Steichen Decl. ¶ 4, Ex. C.) In lieu of monthly payments, Kelley received monthly credits against the attorney's fees she had incurred dating back to November 2009. (*Id.*) Dahle agreed to begin making monthly cash payments to Kelley in November 2010. (*Id.*) Dahle prepared a promissory note documenting these terms and signed it, backdating it to October 2009. (*Id.*; Dahle Dep. at 20:18–21:14.)

The credits against legal fees were the only form of repayment Kelley ever received. Dahle never made any of the monthly payments that were to begin in November 2010. (Kelley Dep. at 116:19–117:7; Schmidt Decl. ¶ 6, Ex. 5, Resp. to Interrogatory No. 5; *see also* Dahle Dep. at 27:14–28:14.) On May 6, 2011, Kelley demanded a full accounting of the money she had advanced (including both the legal fees and the loan) and immediate repayment of the amount remaining.

4

(Dahle Dep. at 91:2–7; Dahle Ex. 11 at P002–003.) Nothing was forthcoming and Kelley filed this suit on June 21, 2011.

As noted above, the Complaint alleges three separate claims, which actually constitute three theories of recovery of the same loss. The first is for breach of contract based on Dahle's failure to repay the loan. The second claim is for negligence or professional malpractice. Kelley alleges that Dahle and/or her law firm breached their duty of care to her "by, among other acts, engaging in business transactions with a current client in a manner prohibited by applicable Wisconsin Supreme Court rules." (Compl., ECF No. 1, ¶ 24.) Finally, Dahle and her firm are alleged to have breached their fiduciary duty to Kelley "by, among other acts, negotiating business arrangements adverse to Kelley's interest. (Id. ¶ 29.) WILMIC contends that the claims do not fall within the coverage provided under its policy or, alternatively, whatever coverage might exist is excluded.

**LEGAL STANDARD**

A motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has the burden of showing there are no facts to support the non-moving party's claim. *Celotex*, 477 U.S. at 322 (1986). In determining whether to order a motion for summary judgment, the court should consider the evidence presented

5

in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. When the record, taken as a whole, could not lead a rational jury to find for the nonmoving party, there is no genuine issue and therefore no reason to go to trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At the pleading stage, an insurer's initial duty to defend is determined by the four corners of the complaint. *Bruner v. Heritage Companies*, 225 Wis. 2d 728, 735, 593 N.W.2d 814, 817 (Wis. App. 1999) (citing *Grube v. Daun*, 173 Wis. 2d 30, 72, 496 N.W.2d 106, 122 (Ct. App. 1992)). "If there are allegations in the complaint, which, if proven, would be covered, the insurer has a duty to defend." *Id.* On summary judgment, however, the test for insurance coverage is no longer limited to the four corners of the complaint. As the Court explained in *Estate of Sustache*, 2008 WI 87, ¶¶ 28–29, 311 Wis. 2d 548, 751 N.W.2d 845, *affirmed by*, 452 B.R. 751 (E.D. Wis. 2011), at the summary judgment stage Plaintiff must come forward with evidentiary facts sufficient to create a triable issue on fact on coverage, *i.e.*, prima facie evidence upon which a reasonable jury could find coverage in favor of Plaintiff. *See also Brown v. Sandeen Agency, Inc.*, 2009 WI App. 11, ¶ 9. 316 Wis. 2d 253, 762 N.W.2d 850.

In this diversity lawsuit, the substantive law of Wisconsin governs. *See State Farm Mutual Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001). In interpreting WILMIC's Policy, "Wisconsin law . . . dictates that any ambiguity in [the] coverage clauses . . . be interpreted broadly in favor of the insured, while exclusionary clauses are narrowly construed." *Robert E. Lee & Associates, Inc. v. Peters*, 209 Wis. 2d 437, 446, 563 N.W.2d 546, 550 (Ct. App. 1997) (citing *Link v. General Cas. Co.*, 185 Wis. 2d 394, 399, 518 N.W.2d 261, 262 (Ct. App. 1994)).

6

## ANALYSIS

WILMIC offers several arguments in support of its contention that its policy does not provide coverage for whatever liability Dahle or her firm may have for damages Kelley seeks, but I will address only one. WILMIC's first contention, and the one I find dispositive, is that the nature of the claim here — i.e., default on a loan — is not covered by its policy. The coverage clause of the policy Dahle obtained from WILMIC reads as follows:

> **Article I**
> **Coverage Agreements**
> **We** will pay all amounts to which this insurance applies, up to the limit of liability stated on the declarations page, that **you** become legally obligated to pay as **damages** as a result of a **wrongful act** by **you** or by any entity for whom **you** as a partner or shareholder in a law firm are legally liable.

(Steichen Decl., Ex. F, "Policy," ECF No. 28-6, art. I.) (emphasis in original).

According to WILMIC, the recovery Plaintiff seeks does not constitute "damages" covered by the Policy. The term "damages" is defined in the Policy as follows:

> **"Damages"** means monetary judgment, final arbitration award or settlement but does not include:
> * * *
> > D. Legal fees, costs, expenses or other expenditures paid or payable by **you** or paid or owed to **you**, whether claimed by way of restitution of specific funds, financial loss or otherwise . . . .

(Policy, art. II.) This provision makes clear that the Policy does not cover unpaid bills nor the cost of suing clients to collect on those unpaid bills. Nor does the Policy cover refunds, discounts, or write-offs that an attorney gives to a client to resolve a dispute.

WILMIC argues Kelley's loan to Dahle is not covered because it constitutes "other expenditures paid . . . to [Dahle]." WILMIC argues that "in effect, Kelley is asking for restitution

7

of the loan proceeds. (WILMIC Br. at 9.) The "damages" she seeks on her negligence claim are the same as those she seeks on her breach of contract and breach of fiduciary duty claims, namely the outstanding principal and interest owed on the loan. As WILMIC sees it, Kelley is seeking return of the loan amount she expended to Dahle.

In response, Kelley argues that a loan is not an "expenditure" of any sort; in fact, Kelley contends, it is the opposite. Money that a client (or anyone) pays or owes to a law firm for legal fees, costs, expenses, or other expenditures, she argues, is an asset of the firm and a liability of the client. A loan, by contrast, is an asset of the lender and a liability to the borrower.

I find WILMIC's argument more convincing. Kelley's definition of "expenditure" is unduly narrow. The word "expenditure" means "a sum paid out." Black's Law Dictionary, 598 (7th ed. 1999). The $300,000 Kelley loaned Dahle constitutes an expenditure, i.e., a sum she paid out, to Dahle. Kelley's lawsuit seeks return of that sum, plus interest. It therefore seeks return or "restitution" of an expenditure paid to Dahle.

Kelley further argues that even if a loan could be classified as an "expenditure" under the Policy, the clause on which WILMIC relies excludes only "*legal* fees, costs, expenses or other expenditures" (emphasis added) from the definition of damages. The word "legal," she contends, modifies each of the nouns that follow it. Although the parties agreed that the amount of interest Dahle owed on the loan would be reduced by legal fees Kelley owed Dahle, the loan itself was not for legal fees. Thus, Kelley argues, the loan is not excluded from the definition of damages payable under the policy.

This argument is unconvincing as well. In support of her construction of the policy, Kelley cites the "standard grammatical rule that when an adjective modifies the first of a series of nouns,

8

a reader will expect the adjective to modify the rest of the series as well . . ." *Village of Hobart v. TCGC, LLC*, 2008 WL 5377911, * 3 (E.D. Wis. Dec. 23, 2008) (quoting *Ryder v. USAA General Indem. Co.*, 938 A.2d 4, 7–8 (Me. 2007)). But she omits the qualification that the rule does not apply when another adjective appears. *Id.* (citing *Lewis v. Jackson Energy Coop. Corp.*, 189 S.W.3d 87, 92 (Ky. 2005)). Here, another adjective, the word "other," precedes and modifies the word "expenditures." Properly construed, this means the expenditures excluded includes those other than legal expenditures. Thus, the loan proceeds Kelley seeks fall outside the damages payable under the terms of the policy. Regardless of the legal theory offered, there is no coverage under WILMIC's policy for recovery of the loan Kelley made to Dahle or the accrued interest.

This construction of the policy is not only the only reasonable construction but, as WILMIC argues, it also makes perfect sense. Professional liability insurance is not an indemnity bond or collateral against default on the payment of an attorney's contractual debt. (WILMIC Br., ECF No. 27, at 10.) Lawyers buy malpractice insurance to protect them from liability to their clients for errors in providing legal services that result in the loss of a meritorious claim or defense to a third party, not for losses resulting from the lawyer's own failure to repay a debt. The policy definition of damages payable under the policy reflects this intent.

## CONCLUSION

Accordingly, and for the reasons set forth, WILMIC's motion is granted and Kelley's claim against it is dismissed on its merits and with prejudice. Because I conclude that the damages Kelley seeks in her lawsuit are not among the damages WILMIC agreed to pay on behalf of Dahle or her law firm in the event of her failure to use due care in providing legal services, there is no need

9

to address WILMIC's additional arguments under the other coverage provisions and exclusions contained in its policy. Finding no just reason for delay, the Clerk is directed to enter final judgment in favor of WILMIC and against Kelley at this time and set the remainder of the case on the Court's calendar for a Rule 16 telephone conference.

**SO ORDERED** this 26th day of July, 2012.

                                              s/William C. Griesbach
                                              William C. Griesbach
                                              United States District Judge